**IT IS ORDERED as set forth below:**



Date: March 30, 2022

_____
Paul W. Bonapfel
U.S. Bankruptcy Court Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| | : | |
| DEMEATRIA LATREASE POWELL, | : | Case No. 18-63788-pwb |
| Debtor. | : | |
| | : | |
| ALONZO Q. HILL, | : | |
| Plaintiff, | : | |
| vs. | : | Adversary Proceeding |
| | : | No. 19-05020-pwb |
| DEMEATRIA LATREASE POWELL, | : | |
| Defendant. | : | |
| | : | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 30, 2021, the Court conducted a trial on the complaint of Alonzo Q. Hill to determine whether a debt incurred by Demeatria Latrease Powell (and her husband, Darnell Powell, who is not a debtor in this case) to purchase a barber shop and salon from Mr. Hill is excepted from her chapter 7 discharge as a debt for property obtained by actual fraud under 11

U.S.C. § 523(a)(2)(A) or for a willful and malicious injury to his property under 11 U.S.C. § 523(a)(6). Mr. Hill obtained a judgment for $ 35,000 on the debt in the State Court of Rockdale County (the "State Court") after a jury trial conducted on July 24, 2017, in the case of *Alonzo Q. Hill v. Darnell and Demeatria Powell,* No. 2016-SV-1266.

As the Court stated in its discussions with counsel for the parties during argument at the trial in this proceeding, the governing legal principles are clear. The debt is excepted from discharge under § 523(a)(2)(A) for actual fraud if Ms. Powell did not intend to perform her obligations at the time she incurred them or at the time she and her husband took possession of the shop. It is excepted from discharge under §523(a)(6) if she acquired the shop through conversion of Mr. Hill's property that was "willful and malicious."

The result turns on factual issues. With regard to actual fraud, the factual question is Ms. Powell's intent at the material times. With regard to willful and malicious injury, the factual question is whether Ms. Powell effectively "stole" the shop, acquiring and then retaining its possession without the intent to pay for it or with the substantial certainty that doing so would injure Mr. Hill's property.

The Court took the matter under advisement and directed the parties to file briefs with regard to the factual issues.

The Court has listened to the recording of the trial, reviewed the exhibits introduced into evidence (referred to herein as "Ex."), read the transcript of the jury trial (Ex. 36, referred to herein as "Tr.") conducted in the State Court case, and studied the post-trial briefs of the parties.

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, applicable in this adversary proceeding under Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law in addition to the conclusions of law the Court made at the trial.

2

## I. Factual Background

Mr. Hill, who worked full-time as a senior network support manager for AT & T, opened a barber shop and salon in Conyers, Georgia, known as Regency Barber & Salon, in February 2008. Mr. Hill formed Regency Barber Shop Inc. on March 6, 2008 (Ex. 20).

The shop had booths that Mr. Hill rented to other cosmetologists for $125 to $150 a week under booth rental agreements. One of the other barbers was Darnell G. Powell, the husband of Ms. Powell, who started in June 2013. (Ex. 1). Mr. Hill had cordial relationships with the Powells, as indicated by photos from social events at the barber shop (Ex. 13, 15, 16), Mr. Hill's testimony about their participation in social and service events that Mr. Hill hosted at the barber shop, and the weekend work that the Powells' son did at the shop.

In the late summer of 2015, Mr. Hill decided to sell the shop so that he could be a "full-time dad" for his son. He offered the shop for sale on Craigslist for $25,000 (Ex. 2) and received an offer from another barber for that amount but decided not to pursue it due to "bad vibes."

Mr. Powell had earlier indicated an interest in purchasing the shop. Ms. Powell, although not a cosmetologist, was interested in the purchase to help her husband realize his dream to own his own shop.

Mr. Hill and the Powells signed a three-paragraph written contract for the purchase of the shop on September 15, 2015. The document, signed by Mr. Hill, Mr. Powell, and Ms. Powell, provided in its entirety (Ex. 3):

> I, Alonzo Q. Hill, the sole owner of Regency Barber & Salon is accepting a deposit of $ 1,000 in the form of Cashier Check for the purchase of Regency Barber & Salon. The $ 1,000 deposit will be used toward the purchase cost of $ 20,000, leaving a balance of $ 19,000.

3

The purchase of the shop must be completed in 60 days from this deposit. If the buyer do not complete the purchase in 60 days the deposit will be forfeit.

With this deposit the final purchase of $ 20,000 will not change and Regency Barber & Salon will not accept any other contracts unless this agreement is not honored in 60 days.

Mr. Hill received a cashier's check drawn on Bank of America, with Ms. Powell as remitter, dated September 18, 2015, payable to "Regency Inc." (Ex. 4).

On October 5, 2015, the parties signed another document (Ex. 5). The first page of the document states the following in its entirety:

> We, Darnell & Demeatria Powell agree to pay the balance of $ 19,000 for the purchase of Regency Barber & Salon on or before November 20, 2015, to Alonzo Q. Hill. This final payment will include the shop and its entirety. Darnell & Demeatria Powell will have no responsibility for any outstanding debts as it relates to the prior ownership by Alonzo Q. Hill.

The second page of the document, titled "Regency Barber & Salon," states information about the business such as its opening date, its incorporation, its accounting firm, its websites, and its assets.

Notwithstanding the terms of the agreement providing for the sale to occur only upon payment of the balance due of $19,000, the parties agreed for the Powells to take possession of the barber shop on November 1, 2015, without paying the $ 19,000, which would be due on November 20.

Ms. Powell testified at trial that the money for the initial $ 1,000 payment came from her 401(k) account with her employer and that she would use another $10,000 from this source to

4

pay part of the remaining $19,000. She further testified that Mr. Powell would provide the other $9,000 from his full-time and barbershop jobs. At the State Court trial, Mr. Powell testified that they could not pay the $19,000 due on November 20 because they did not get funding by that time. (Tr. 103, line 12 to 104, line 4; 109, line 17 to 110, line 18). No one at the State Court trial mentioned Ms. Powell's 401(k) account as a source of funding.

Mr. Hill negotiated with the landlord, M & A Partners, for a new lease between the landlord and the Powells and the transfer of the existing security deposit to the landlord (Ex. 6). The landlord and the Powells executed a lease for the premises, beginning on November 1, 2015. (Ex. 7). The Powells agreed to pay Mr. Hill the amount of the transferred deposit, $ 2,190. The landlord agreed to execute an agreement holding Mr. Hill harmless from any liability on the existing lease upon execution of the new one. (Ex. 6).

Mr. Hill and the Powells also effected the transfer of utility accounts for the barber shop to the Powells, starting on November 1.

Mr. Hill testified at trial that the Powells requested that they take possession on November 1 for tax purposes. At the State Court trial, however, Mr. Powell testified that Mr. Hill instructed the Powells to get everything out of Mr. Hill's name by November 1. (State Court Transcript ("Tr."), Ex. 36, at pages 106, line 11 to page 107, line 23; page 110, lines 19-24). Mr. Hill, who represented himself at the State Court trial (but did not testify in support of his case), did not ask Mr. Powell whether Mr. Powell had requested early possession for tax purposes.

A "farewell event" took place at the shop on October 24 for breast cancer awareness and to celebrate the transition of the business. In a "farewell book" containing photographs of persons connected to the shop, the guests were invited to write a note to Mr. Hill. Mr. Powell's

5

handwritten note thanked Mr. Hill, expressed his appreciation for Mr. Hill and his service to the community, and stated, "I will continue what you started." (Ex. 14).

The Powells took possession of the shop on November 1 as the parties contemplated and in accordance with the new lease they had executed.

On the morning of Thursday, November 19, 2015 – the day before the $ 19,000 payment was due – Mr. Hill sent a chat message to each of the Powells, asking about arrangements for him to collect his money either that day or the following day. (Ex. 8, 9). He did not receive a response to the chat messages.

The next morning, Friday, November 20, he sent another chat message to each of them, asking at what time and place they would meet to settle the transaction. (Ex. 8, 9). Ms. Powell called Mr. Hill, who in a chat message to Ms. Powell that evening stated that he was out eating and asked what time and place he needed to meet that night. (Ex. 9). He did not receive a response to the chat message.

At the State Court trial, Mr. Powell testified that the Powells tried to call Mr. Hill in response to his text message "because we don't do business via text." (Tr. 102). The call, he explained, was to "reach out to [Mr. Hill] . . . to tell [him] that we were going to be late." [Tr. 103]. Other than the chat message, they received no response to the call. (Tr. 102).

Between 10 a.m. and 10:30 a.m. on the next day, Saturday, November 21, Mr. Hill testified in this proceeding, he went to the shop. At 11:55 the Rockdale County Sheriff's Office received a call from Mr. Hill, and an officer arrived at the shop at 11:59. (Ex. 10).

Between the time of Mr. Hill's arrival at the shop and the arrival of the officer, Mr. Hill testified, he entered the shop; he told Mr. Powell he had come to pick up his money; Mr. Powell

6

coldly responded, "Take me to court;" Mr. Hill got emotional, went outside, and called the Sheriff.

When the officer arrived, Mr. Hill testified, Mr. Powell told the officer that Mr. Hill had been disruptive. At some point Ms. Powell arrived, with a copy of the lease between the landlord and the Powells. The officer determined that it was a civil matter and left at 12:17. (Ex. 10).

That evening, Mr. Hill sent chat messages to each of the Powells that stated (Ex. 8, 9):

Do I need to proceed with legal proceedings? Per texts I'm receiving Darnell you are telling people you and your wife have been trying to reach me for the last 2 wks which is not true. They also said y'all changed the plan and was giving me 9k today and in 7 days the remainder of 10k. Don't forget y'all owe me $2190 for the deposit as well.

Mr. Hill received no response. The evidence does not show any further communication between the parties with regard to payment, other than at a mediation session in connection with the State Court action and at the meeting of creditors in Mr. Powell's later bankruptcy case.

The transition of the county business license and cosmetology license for the shop did not go smoothly. A cosmetology license in the name of "Regency Barber Shop" with Darnell Powell as owner was issued. (Ex. 19). The name of the shop was changed to "Ladies and Gentlemen Beauty and Barbershop," the cosmetology license was changed to that name (Ex. 23), a county business license in that name was issued (Ex. 32), and Ms. Powell organized a limited liability company in that name. (Ex. 24). Testimony at the State Court trial addressed some of the details of the transition (Tr. 27-28, 61-74, 76-83, 101,105-06;114), but they are not material in this proceeding.

7

Mr. Hill filed his *pro se* complaint against the Powells in the State Court on March 8, 2016, seeking judgment for $20,000 for the purchase amount, $3,460 per month for lost income, interest, costs, and attorney's fees. (Ex. 27). The Powells, through counsel, filed an answer and counterclaim on April 11, 2016. (Ex. 28). The counterclaim alleged that Mr. Hill had tortiously interfered with the business and sought compensation, as well as an injunction against his posting false and malicious matters on electronic media, going on the business premises, and contacting barbers, hair stylists, and customers of the business, but the prayer for relief did not include a request for damages.

In November 2016, Mr. Hill applied for a criminal warrant against the Powells, which the judge dismissed because of the pendency of the civil lawsuit. (Tr. 134-36).

Prior to the State Court trial, the State Court ordered the parties to mediate. The Powells offered to pay $10,000. Mr. Powell's testimony at the State Court trial indicated that this was an "up front" payment (Tr. 116, lines 18-20), implying that the offer included full payment, but it is not clear that the Powells offered full payment. Mr. Hill, who described the mediation as a "joke," rejected the proposal.

After a trial in the State Court on July 24, 2017 (Ex. 36), the State Court Judge directed a verdict on the counterclaim (which the Powells prosecuted as a defamation claim (Tr. 121-27)) because the Powells had produced no evidence of any damages. (Tr. 161, lines 14-20; Ex. 31). The jury returned a verdict finding the Powells liable to Mr. Hill for $35,000 (Ex. 30), and the State Court entered judgment in that amount. (Ex. 30).

Possibly because of Mr. Hill's social media postings about the Powells and the transaction described in Mr. Hill's testimony with regard to the counterclaim in the State Court

trial (Tr. 130-33, 157-58), or possibly because of what Ms. Powell described as Mr. Powell's gambling problem, the business failed.

At the time of the State Court trial in July 2017, the Powells were facing eviction. (Tr. 111, line 20, to 113, line 5). The landlord took over the business assets.

Mr. Powell filed a voluntary chapter 13 bankruptcy case on November 8, 2017. Mr. Hill obtained relief from the co-debtor stay to seek to collect from Ms. Powell. After confirmation of his plan, Mr. Hill converted the case to chapter 7 and received a discharge. Mr. Hill did not seek a determination that the judgment against Mr. Powell was excepted from discharge.

After Mr. Hill garnished Ms. Powell's wages, she filed her chapter 7 case on August 16, 2018. Mr. Hill timely filed his complaint, which, as amended, seeks a determination that the judgment against her is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) or (a)(6).

## II. Controlling Issues

Mr. Hill states two reasons why Ms. Powell's debt to him is excepted from her chapter 7 discharge.

First, he states that she received property from him by actual fraud such that the debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A). As the Court discussed with the parties' counsel during the trial, this is not a false pretenses or false representation case. The theory of Mr. Hill's case is that the Powells collectively, and Ms. Powell specifically, engaged in a fraudulent scheme to acquire the shop with the intent not to pay for it as agreed. (Plaintiff's Post-Trial Brief [Doc. No. 33] ("P. Br.") at 3-8).

To prevail on this claim, Mr. Hill must establish, by a preponderance of the evidence, that, at the time the sales contract was signed on September 20, 2015, or at the time the Powells

9

took possession of the shop on November 1, 2015, Ms. Powell did not intend to pay the purchase price in accordance with the agreement.

The second claim is that the debt is excepted from discharge under 11 U.S.C. § 523(a)(6) because the Powells caused "willful and malicious injury" to his property. The theory is that the Powells converted Mr. Hill's assets. More specifically, Mr. Hill contends that they stole his business. (P. Br. 9-10).

To prevail on this claim, Mr. Hill must establish, by a preponderance of the evidence, that Ms. Powell converted his property and that she did so willfully and maliciously.

## III. Fraud

Mr. Hill contends that the evidence establishes at least two sets of circumstances that require an inference that the Powells did not intend to pay the purchase price. (P. Br. 3-7).

The first is that they had no ability to pay. (P. Br. 4-5).

The second is that their taking possession of the shop before the payment was due was "an instrumental step in furthering their scheme to steal the business." (P. Br. 5). Because Mr. Hill's recourse for their failure to pay the $19,000 balance was to keep the business, he explains, taking early possession deprived him of that recourse and was "a necessary step in furtherance of their scheme to steal the business." (P. Br. 6).

In addition, Mr. Hill points to Mr. Powell's "sue me" response to his request for payment at the shop on November 21 as evidence that the Powells entered into the agreement with fraudulent intent. (P. Br. 7-8).

The Court agrees that these circumstances tend to prove that the Powells did not intend to perform as agreed. But the Court finds that the preponderance of the evidence does not support such a finding.

10

The Powells testified (Ms. Powell at the trial in this Court and both of them in the State Court) that they intended to pay the purchase price and that they thought they had the ability to do so. Noting inconsistencies regarding the details of where the money would come from and the absence of evidence to corroborate the testimony, Mr. Hill suggests that their story is fabricated. (P. Br. 4). Perhaps, but the Court finds Ms. Powell's testimony on this point to be credible in the circumstances.

Ms. Powell's testimony that her 401(k) would partially fund the transaction is not necessarily inconsistent with Mr. Powell's general reference to "funding" and "loans" that did not come through. The absence of corroborating documentary evidence that Ms. Powell withdrew money from her 401(k) (such as a 2015 tax return) or that the Powells had sought a loan does not persuade the Court to disregard her testimony. The evidence does not show any details about a 401(k) withdrawal or the efforts the Powells made to secure financing that might indicate that the Powells in fact were not expecting to obtain a loan or that they knew they could not possibly obtain one, but the burden of proof is on Mr. Hill, not Ms. Powell.

Inability to pay, standing alone, is insufficient to establish the required subjective intent not to pay that is essential to a finding of actual fraud. Viewed in hindsight on an objective basis, it may be that the Powells had no realistic prospects for obtaining a loan. Although Mr. Hill produced no evidence on this point, it is a fair inference from the fact that they did not obtain one. A finding of fraudulent intent, however, requires that a preponderance of the evidence establish that the Powells *knew* they could not obtain a loan and could not possibly pay the purchase price as agreed. The preponderance of the evidence here does not do that.

11

The Court cannot find that the preponderance of the evidence establishes that the Powells engaged in a scheme to take early possession of the shop to effect a "scheme to steal the business."

As an initial matter, the Court finds that it is more likely than not that Mr. Hill originated the early possession, as Mr. Powell testified at the State Court trial. (Tr. 106-08). Mr. Hill's explanation at the trial in this Court that the Powells wanted early possession for tax purposes does not make sense; three weeks of additional depreciation could not have had a material affect on their tax liability, and the Court cannot conceive of any other tax deduction that ownership of the business could have generated. Eliminating his potential liability on the lease and for utilities of the business, in contrast, seemed important to Mr. Hill, as his concern for a "hold harmless" agreement from the landlord indicates. (Ex. 6).

Regardless of whether Mr. Hill or the Powells initiated the idea of early possession fact that the Powells took early possession does not persuade the Court that they did so with the intent that they could thereby avoid or delay payment of the balance of the purchase price. The preponderance of the evidence does not establish that they did not intend to make the $ 19,000 payment as agreed.

Mr. Powell's "sue me" response to Mr. Hill's request at the shop on November 21 for payment is strong evidence that at least Mr. Powell never intended to perform as agreed. The statement evidences an intent not to pay until compelled to do so. Such an intent obviously is not an intent to pay in accordance with an agreement. An inference arises that his intent existed from the inception of the contract. And an inference may arise that Ms. Powell shared his intent or knew of it and participated in it.

12

On the other hand, the intent may have arisen at a later time. Here, if Mr. Powell's attitude arose only after the Powells took possession, no fraudulent intent existed when the parties signed the agreement or when the Powells took possession. In that case, the Powells did not obtain the assets by fraud.

The Court has struggled to determine why a person who writes what appears to be an appreciative note to Mr. Hill less than one month later tells him to go to court to collect his money.

On the one hand, the answer may be that Mr. Powell wrote the note as part of a scheme to acquire the assets without paying for them as agreed. On the other hand, something may have happened at the November 21 encounter that prompted the "sue me" response.

The question is a close one. The only direct evidence about the encounter is Mr. Hill's testimony. Ms. Powell was not present at the time. Mr. Powell did not testify at the trial in this Court, and he did not testify about the encounter in the State Court trial.

Mr. Hill's testimony condenses an encounter of roughly an hour and a half into four parts: entry into the shop with customers and other barbers present; request for payment; Mr. Powell's "sue me" response; Mr. Hill's exit from the building. Something more must have happened.

The Court answers the question based on circumstantial evidence of the states of mind of Mr. Hill and Mr. Powell at the time of the November 21 confrontation.

Mr. Hill expected the Powells to pay on the date due. His chat messages on November 19 and 20 indicate that in his mind no conversation about payment was necessary because the only question was when and where to meet for him to receive his money.

13

The problem was that, on November 21, the Powells did not have the money. As Mr. Powell explained at the State Court trial, they had signed the lease and were obligated to pay rent and also had to pay Mr. Hill. They were attempting, he said, to pay Mr. Hill and sustain the business at the same time. (Tr. 108, lines 8-12).

The tenor of the evidence before the Court indicates that Mr. Hill was quite insistent that he be paid immediately and that Mr. Powell wanted to pay Mr. Hill but did not have the money to do so.

From this, the Court infers that, on the morning of November 21, insistence met impossibility for 90 minutes in a heated confrontation. It follows that Mr. Powell's "sue me" response arose out of his inability to meet Mr. Hill's insistence on immediate payment.

Thus viewing the evidence as a whole, the Court finds that a preponderance of the evidence does not establish that Mr. Powell's "sue me" attitude existed before the Powells took possession of the shop on November 1. It is at least equally likely that the response arose from the fact that the Powells could not possibly pay in full that day, and that if Mr. Hill wanted immediate payment in full, the only way to do so was to proceed in court.

The Court recognizes that Mr. Hill has a different view of the incident and disagrees strongly with the inferences that the Court has drawn. The Court respects and appreciates his views. The Court emphasizes that, in drawing these inferences, the Court by no means is critical of Mr. Hill's actions as the Court has interpreted them. He had a right to insist on immediate payment. He was justifiably disappointed and angry that he would not receive payment as agreed for the business he had built from someone he had worked with for years and trusted. Rather, the Court's reasoning is that it is at least equally likely that the circumstances prompted

Mr. Powell's "sue me" response and that the response was not indicative of his intent prior to November 1.

Based on the foregoing, and considering all of the evidence in this proceeding, and taking into account the demeanor and credibility of the witnesses, the Court finds that Mr. Hill has not established, by a preponderance of the evidence, that the Powells collectively, and Ms. Powell in particular, did not intend to pay Mr. Hill in accordance with the agreement at the time it was made or at the time they took possession of the shop.

**IV. Willful and Malicious Injury to Property**

Mr. Hill begins his argument that Ms. Powell willfully and maliciously injured his property, such that the debt is excepted from discharge under 11 U.S.C. § 523(a)(6), by quoting a statement by the State Court Judge (outside the presence of the jury) in colloquy with Mr. Powell about the counterclaim for defamation.  (P. Br. 9).  Mr. Powell had explained that the counterclaim asserted that Mr. Hill had falsely accused the Powells of a crime:  stealing Mr. Hill's business.

The State Court Judge responded that "the chances of [the counterclaim] going to the jury are slim."  (Tr. 124, lines 9-10).  The Judge continued (Tr. 124, lines 11-16):

> Because legally what you have done is steal the business.  That is my legal opinion.  I mean, you just sat here and told the jury and the Court that you stipulated that you owed him the money and that you didn't pay him the money.

The State Court did not decide the counterclaim on this ground, however.  After hearing evidence on the counterclaim, the State Court directed a verdict in favor of Mr. Hill because the Powells produced no evidence of any damages.  (Tr. 161, lines 14-20; Ex. 31).

Mr. Hill contends that a "malicious injury" includes conversion and concludes, "[C]onversion is exactly what occurred here; [Ms. Powell] stole [Mr. Hill's] business." (P. Br. 10). With regard to willfulness, Mr. Hill asserts that Ms. Powell acted willfully because she "took possession of the business knowing that it was substantially certain that [Mr. Hill] would not get paid." (P. Br. 10). Mr. Hill infers willfulness based on the same evidence that he produced regarding actual fraud. (P. Br. 10).

This Court disagrees with the State Court's remarks during colloquy and the proposition that the Powells, and specifically Ms. Powell, stole Mr. Hill's business. Buying a business or any other property without paying for it is not a crime in the absence of other circumstances. The preponderance of the evidence in this proceeding does not establish any other circumstances that establish a crime.

The parties agreed that the Powells would take possession of the shop on November 1. They arranged with the landlord for the termination of the existing lease for the premises and the execution of a new lease with the Powells as tenants. They transferred the utility accounts to the Powells.

The Powells did not steal the assets. Mr. Hill voluntarily surrendered possession of them. The assets did not leave the shop. The parties expected the Powells to begin operating the business on November 1, which necessarily meant that they would use the assets. As the previous Part discusses, a preponderance of the evidence does not establish that the Powells took possession of the shop with no intent of paying for it.

These circumstances indicate that the parties effectively modified their agreement by their conduct to provide for the sale of the assets on November 1 and for payment to occur later

16

on November 20. Under this view, the Powells owned the assets and had the obligation to pay for them.

As Mr. Hill correctly observes, these circumstances deprived Mr. Hill of his "most substantial recourse" for a breach of the agreement, *i.e.,* retention of the business. This unfortunate result for him, however, arose as a natural consequence of modification of the agreement to permit possession before payment.

In any event, the Court cannot find that an act is a "malicious" injury to property when the act took place with the consent – and most likely at the instigation of – the injured party. Even if legal title to the assets did not change on November 1, the Powells' taking of possession of them was not malicious.

Nor was it ""willful," which requires that the act be substantially certain to cause injury. The evidence establishes that the Powells did not pay Mr. Hill when due on November 20, but the preponderance of the evidence does not that it was substantially certain on November 1 that the payment would not be made on time.

Mr. Hill alternatively posits that the debt is excepted from discharge under § 523(a)(6) because the Powells' taking possession of the business "and subsequent intentional failure to pay deprived [Mr. Hill] of his most substantial recourse against a breach of the Agreement." (P. Br. 10). As the previous Part discusses, a preponderance of the evidence does not show that the Powells did not intend to pay, and nothing indicates that they had the ability to pay but intentionally did not.

## V. Conclusions of Law

Based on the findings of fact set forth above and for reasons stated at the trial, the Court makes the following conclusions of law.

17

A debt is excepted from discharge under 11 U.S.C. §523(a)(2)(A) if the debtor received money or property based on actual fraud. Actual fraud exists if a debtor acquires money or property or an extension of credit in exchange for a promise to pay money or perform an obligation that the debtor does not intend to honor at the time the promise is made.

Mr. Hill has failed to prove by a preponderance of the evidence that Ms. Powell did not intend to pay him in accordance with their agreement at its inception or when the Powells took possession. Accordingly, the debt is not excepted from discharge under § 523(a)(2)(A).

A debt is excepted from discharge under § 523(a)(6) if it is for "the willful and malicious injury by the debtor to another entity or to the property of another entity." Mr. Hill has failed to prove by a preponderance of the evidence that Ms. Powell's conduct was either willful or malicious. Accordingly, the debt is not excepted from discharge under § 523(a)(6).

Simply put, Mr. Hill's claims are based on the proposition that the Powells stole his business because they never intended to pay for it. The Court understands why Mr. Hill characterizes the facts in this way and sympathizes with his loss. But simply put, the Court is not persuaded by a preponderance of the evidence that the Powells, and specifically Ms. Powell, engaged in a course of conduct to take his shop without paying for it. That evidentiary finding effectively means that the debt is not excepted from discharge.

Because Mr. Hill is not entitled to any relief in this proceeding, he is not entitled to any attorney's fees.

Ms. Powell asserted a counterclaim in this proceeding for attorney's fees but produced no evidence at trial to support the counterclaim and, during argument, withdrew it. The counterclaim is, therefore, dismissed, with prejudice.

The Court will enter a separate judgment determining that the debt Ms. Powell owes to Mr. Hill is not excepted from discharge under § 523(a)(2)(A) or § 523(a)(6).

END OF ORDER

**These findings of fact and conclusions of law have not been prepared for publication and are not intended for publication.**

Distribution List

Leslie M. Pineyro
Jones and Walden, LLC
699 Piedmont Avenue NE
Atlanta, GA 30308

Jamel Q. Harvey
King & King Law LLC
215 Pryor Street, S.W.
Atlanta, GA 30303